SOL LUIS DESCARTES, TESORERO DE PUERTO RICO, peticionario, *v.* TRIBUNAL DE CONTRIBUCIONES DE PUERTO RICO, recurrido; B. SUÁREZ, INC., interventora.

Número 290.

*Sometido:* 9 de diciembre de 1952. *Resuelto:* 13 de enero de 1953.

*Hon. Procurador General Interino J. B. Fernández Badillo* y
*Arnaldo P. Cabrera, Procurador General Auxiliar,* abogados
del peticionario; *F. L. San Miguel,* abogado de la interven-
tora, querellante en el pleito principal.

EL JUEZ ASOCIADO SEÑOR ORTIZ emitió la opinión del tri-
bunal.

En el anterior Tribunal de Contribuciones de Puerto Rico
la contribuyente y aquí interventora, B. Suárez, Inc., radicó
una demanda contra el Tesorero de Puerto Rico en la que
solicitaba que se dejase sin efecto la imposición de una con-
tribución sobre la propiedad notificada a la contribuyente el
día 18 de julio de 1950, cuya contribución envolvía la suma
de $1,801.78. La contribución se impuso sobre ciertas exis-
tencias de tabaco en poder de la contribuyente el día 15 de
enero de 1950. Después de haber el Tesorero presentado
su contestación y de haberse celebrado la vista del caso, el
Tribunal de Contribuciones finalmente resolvió que el tabaco
en cuestión estaba, el día 15 de enero de 1950, exento del
pago de contribución sobre la propiedad por constituir mate-
ria prima bajo las disposiciones de la Ley núm. 61 aprobada

el 5 de mayo de 1945 (pág. 221) y que la aplicación retroactiva a dicho tabaco de la Ley núm. 30 aprobada el 30 de marzo de 1950 ((1) pág. 87), a los fines de la imposición de la contribución era inconstitucional e inválida. El Tesorero ha tramitado un recurso de *certiorari* para ante este Tribunal, de acuerdo con el procedimiento que regía anteriormente en cuanto a esta clase de casos.

 De acuerdo con la prueba presentada ante el tribunal a quo, y con las conclusiones formuladas por este último, la historia del tabaco en cuestión, en cuanto al proceso de despalillado y venta, puede resumirse en la siguiente forma:

El tabaco objeto de la contribución fué sometido al mismo proceso que se utiliza en cuanto a todo el tabaco producido en Puerto Rico. Después que el cosechero recoge el tabaco lo vende a las empresas despalilladoras y entonces el tabaco es puesto en montones o pilas para su fermentación. Durante la fermentación, y para la obtención de la mejor calidad de tabaco, se requiere una inspección adecuada mientras el tabaco pasa por predeterminados grados de temperatura, durando ese proceso por espacio de aproximadamente tres meses. Finalmente el despalillado empieza en los meses de junio y julio de cada año, cuando ya el tabaco se haya "curado" y empacado con sus hojas y "palotes". Entonces se moja el tabaco con "pisteros" o boquillas de manga y se coloca luego sobre "cerchas" metálicas para que se "escurra" el agua. Una vez mojado, su temperatura vuelve a subir, en las nuevas pilas que con él se hacen, y se rehacen de tres a cinco veces para conseguir su ablandamiento y es llevado, después de haber sido secado en parrales de metal sometidos a una temperatura artificial creada, a los obreros u obreras encargados de su despalillado. Estos últimos le quitan alrededor de dos terceras partes de los palotes en las hojas y ponen entonces el tabaco en pequeños grupos o montones, los cuales se recogen y son echados en cajas que

se llevan al departamento de envasado, en el cual las empacadoras colocan las hojas en distintos grupos de acuerdo con la clase de tabaco correspondiente. Una vez hechos los paquetes, se procede a prensarlos en una prensa mecánica, y a coserlos. Mientras el tabaco se encuentra en el departamento de empacado, los compradores de los Estados Unidos examinan las pacas y entonces hacen contratos de compraventa con las empresas despalilladoras. El tabaco luego se fumiga con bisulfuro de carbono y se envía entonces a los muelles que las compañías compradoras indiquen.

En este caso la contribuyente otorgó el día 20 de junio de 1949, un contrato de compraventa del tabaco con la Consolidated Cigar Corporation, quedando esta última obligada a comprar el tabaco que quedase finalmente despalillado perteneciente a la contribuyente, a precios por libras fijados en el propio contrato. La contribuyente y vendedora venía obligada a empacar y despalillar el tabaco. La efectividad de la venta estaba sujeta a un examen posterior del tabaco despalillado por representantes de la compradora, antes de que fuera enviado a los muelles para su embarque, todo ello desde el punto de vista de la calidad del tabaco. Los precios habrían de satisfacerse por libra al efectuarse cada embarque que se hubiere finalmente aceptado por la compradora. En el contrato de compraventa se disponía que los precios ya estipulados eran fijos y "libres de alteración alguna, ya ocurriera un aumento o una rebaja en los gastos o en los costos de manipulación del tabaco que pudiera sobrevenir por cualquier causa o motivo."

El despalillado del tabaco envuelto en el caso de autos empezó en julio de 1949 y continuó llevándose a cabo hasta febrero de 1950. El 15 de enero de 1950 todavía había bastante tabaco que aún estaba en proceso de despalillado pero el día 30 de marzo de 1950 ya no quedaba tabaco alguno en el establecimiento de la contribuyente.

La Ley 61 de 5 de mayo de 1945 tenía por objeto el exi-

mir del pago de contribuciones a ciertas materias primas necesarias para la fabricación de artículos. Dicha ley disponía lo siguiente:

"Artículo 1.—A los efectos de esta Ley se entenderá por 'materia prima' no sólo los productos en su forma natural derivados de la agricultura o de las llamadas industrias extractivas, sino cualquier subproducto (*by-product*), cualquier producto parcialmente elaborado (*semi-manufactured*), o cualquier producto terminado, siempre y cuando que se utilice, bien como ingrediente en la manufactura de otro producto industrial o como accesorio o parte integrante del dicho otro producto industrial.

"Artículo 2.—Se entenderá por 'producto terminado' aquel artículo para el comercio que se obtenga uniendo dos o más materias primas o sometiendo una o más de éstas a procesos industriales, siempre que en uno u otro caso se usen métodos predeterminados, y se aplique mano de obra en forma directa o indirecta.

"Artículo 3.—La 'materia prima' que pueda garantizarse estar destinada a la producción de artículos terminados, estará exenta del pago de contribuciones sobre la propiedad mientras se encuentre en poder de su productor, importador a Puerto Rico, del productor del artículo terminado, o de algún distribuidor intermediario que la tenga destinada para venta o entrega a un productor de artículos terminados, en cuya fabricación entre esa materia prima.

"Artículo 4.—Mediante reglas y reglamentos que al efecto promulgue, el Tesorero de Puerto Rico dispondrá los métodos necesarios para hacer efectiva esta Ley, pudiendo exigir de los contribuyentes la presentación de cualquier evidencia que pudiera ser necesaria al efecto. Tendrá, además, el Tesorero de Puerto Rico, poder de reglamentación general para hacer esta Ley efectiva en todo lo que no sea incompatible con lo aquí dispuesto.

"Artículo 5.—Toda ley o parte de ley que se oponga a la presente, queda por ésta derogada.

"Artículo 6.—Esta Ley empezará a regir el día primero de julio de 1945."

El tabaco en cuestión estaba antes del día 15 de enero de 1950 exento del pago de contribuciones ya que constituía

"materia prima" bajo las disposiciones de la referida Ley 61 de 1945. El tabaco despalillado constituía un "producto terminado", ya que se obtiene sometiendo el tabaco crudo a procesos industriales, usando métodos predeterminados y se aplica mano de obra en forma directa o indirecta a los fines de producir el tabaco despalillado. La propia Ley 61 de 1945 disponía que tal "producto terminado" constituía "materia prima" exenta del pago de contribuciones sobre la propiedad mientras se encontrase en poder del productor, o sea, de su despalillador. Aun si el 15 de enero de 1950 aún no estaba despalillado el tabaco en su totalidad, sin embargo, para esa fecha el tabaco estaba parcialmente elaborado. De acuerdo con la propia Ley 61 de 1945 un producto parcialmente elaborado también constituía materia prima exenta del pago de contribuciones.

En el caso de *P. Lorrillard Co.* v. *Ross*, 209 S.W. 39, la contribuyente despalillaba tabaco en Kentucky y luego enviaba el tabaco así despalillado a fábricas de su propiedad localizadas en otros estados a los fines de convertirlo en cigarrillos, cigarros y tabaco de mascar. Una ley del Estado de Kentucky disponía que estarían exentos de contribuciones sobre la propiedad los productos, en curso de manufactura, de personas, firmas o corporaciones, actualmente dedicadas a la manufactura y también estaría exenta de contribuciones la materia prima actualmente en poder de los elaboradores en sus fábricas o plantas siempre y cuando que tal materia prima fuese utilizada con propósitos de manufactura. Se resolvió que en vista de que el producto final (cigarrillos o cigarros) no se manufacturaba en Kentucky, o sea, en el sitio donde se solicitaba la exención, el tabaco despalillado no estaba exento bajo la ley ya mencionada. De dicha ley de Kentucky surgía la intención legislativa al efecto de que la exención se otorgase solamente si el producto final se manufacturaba en Kentucky. Tal intención no surge de la Ley 61 de 1945. Lo que se requiere es que la materia prima

se utilice como ingrediente en la manufactura de otro producto industrial o como accesorio o parte integrante de dicho otro producto industrial. La materia prima estaba exenta mientras se encontrase en poder del productor de la materia prima. No se indica en la ley, ni se infiere de ella, que el producto industrial final fuese manufacturado en Puerto Rico. Si el propósito legislativo hubiese sido exclusivamente el de estimular la fabricación en Puerto Rico de cigarros, cigarrillos u otros productos finales, habría entonces margen para la interpretación adoptada por la Corte Suprema de Kentucky en el caso ya citado. Sin embargo, la intención legislativa pudo muy bien haber sido la de estimular la producción de materia prima en Puerto Rico a los fines de su exportación para ser usada en procesos posteriores de fabricación en otros sitios.

Tenemos que llegar, por lo tanto, a la conclusión de que, antes del día 15 de enero de 1950, el tabaco en cuestión estaba exento del pago de la contribución sobre la propiedad. Sin embargo, el día 30 de marzo de 1950 se aprobó la Ley núm. 30 que dispone lo siguiente:

"Sección 1.—El Artículo 1 de la Ley núm. 61, aprobada en 5 de mayo de 1945, queda por la presente enmendado de manera que lea como sigue:

"Artículo 1.—A los efectos de esta Ley se entenderá por 'materia prima' no sólo los productos en su forma natural derivados de la agricultura o de las llamadas industrias extractivas, sino cualquier subproducto (*by-product*), cualquier producto parcialmente elaborado (*semi-manufactured*), o cualquier producto terminado, siempre y cuando que se utilice, bien como ingrediente o como parte integrante de otro producto industrial, de modo que al realizarse el proceso industrial, dicha 'materia prima' pase totalmente y por completo a formar parte del producto terminado, o se consuma por completo, se extinga totalmente, y deje de existir.

"Sección 2.—El Artículo 3 de la referida Ley núm. 61, aprobada en 5 de mayo de 1945, queda por la presente enmendado de manera que lea como sigue:

"Artículo 3.—La 'materia prima' que pueda garantizarse estar destinada a la producción de artículos terminados, estará exenta del pago de contribuciones sobre la propiedad mientras se encuentre en poder del productor del artículo terminado.

"Sección 3.—Esta Ley por ser de carácter urgente, empezará a regir inmediatamente después de su aprobación, pero sus disposiciones tendrán efecto retroactivo al 1ro. de enero de 1950."

Al aprobarse en la Cámara de Representantes de Puerto Rico el Proyecto de la Cámara 365, que se convirtió luego en la ley ya transcrita número 30 de marzo de 1950, ocurrió lo siguiente:

"(Se hace constar:

"(Primero: Que el P. de la C. 365 fué objeto de la siguiente explicación en Comisión Total:

"(Sr. Ortiz: La Ley 61 de 5 de mayo de 1945 está redactada en términos tan generales que de aplicarse su texto literalmente por nuestras cortes se perdería una gran porción de la contribución actual sobre la propiedad personal. Un ejemplo de esta aseveración es la decisión reciente de nuestra Corte de Contribuciones en el caso de *J. R. Nieves* v. *Tesorero (P–702 T. C.,* resuelto en 10 de noviembre de 1949), en el cual se declaran exentos de contribución sobre la propiedad los toneles de envejecimiento de ron, por considerarse materia prima según la definición de este concepto en dicha ley. La contribución a devolverse, reintegrarse o acreditarse según la referida sentencia monta, de acuerdo con un estudio hecho, a más de $50,000.

"De acuerdo con el texto de la ley sería interminable la lista de productos o materias que quedarían exentas de contribución sobre la propiedad, pero vamos a nombrar solamente algunos para dar una idea ligera de lo que esto puede llegar a significar:

"1. Azúcar para fábricas de dulces, reposterías, fábricas de helados, etc.

"2. Azúcar para exportar al norte a ser refinada o convertida en otros productos.

"3. Frutas y demás substancias para enlatado, para convertir en sirops para fuentes de soda, etc.

"4. Productos para fábricas de muebles.

"5. Materiales de construcción.

"6. Materia prima para fábricas de ropa hecha y talleres de costura.

"7. Cemento y otras substancias para fábricas de bloques, losetas, cerámica, etc.

"8. Materiales para fundiciones, accesorios para piezas terminadas, etc.

"9. Materiales para imprentas.

"10. Drogas y substancias para fábricas de medicinas, perfumes, etc.

"Además, hay que considerar que los productos o materias eximidas de contribución por esta Ley, lo son no solamente cuando están en manos del productor del producto terminado, sino también cuando estén en poder de cualquier intermediario, con la única limitación de que *'pueda garantizarse estar destinada a artículos terminados'*. Por medio de contratos con productores de artículos terminados, cualquier comerciante podría eximir de contribución la mayor parte de sus existencias.

"Las enmiendas que se sugieren a esta Ley van encaminadas a cerrar un poco esta enorme puerta de escape pero conservando siempre la intención legislativa de estimular la industria.

"El artículo 1 que describe de una manera abarcadora lo que es materia prima, se propone enmendar en dos aspectos:

"*a.* Eliminar la frase 'o como accesorio', pues podría entrar en esa descripción toda la propiedad de una central. Quedarían en la ley las frases: 'como ingredientes', y 'como parte integrante'.

"*b.* Añadir una disposición de que para ser eximible el producto o materia debe desaparecer o consumirse pasando a formar parte integrante del artículo terminado. La idea es excluir toneles, y otras máquinas o accesorios."

La ya citada Ley núm. 30 de 30 de marzo de 1950 limita la exención contributiva a aquella materia prima que estuviese en poder del productor del artículo terminado, o sea, en este caso del productor de cigarros o cigarrillos. La ley anterior, núm. 61 de 1945, extendía la exención a la materia prima en poder de su productor, o sea, de la contribuyente en este caso. Es indudable que la Ley núm. 30 de 1950 eliminó la exención contributiva que disfrutaba el tabaco en cuestión antes del día 1 de enero de 1950. Empero, el Tri-

bunal de Contribuciones resolvió que era inconstitucional la aplicación retroactiva de la Ley núm. 30 de 1950 al tabaco de la contribuyente en existencia el día 15 de enero de 1950. Ese es, precisamente, el problema esencial en este caso.

 Generalmente, las leyes que imponen contribuciones retroactivamente no son inválidas *per se*, o sea, que el hecho en sí de su retroactividad no implica, necesariamente, su inconstitucionalidad. *Tes.* v. *Tribl. Contribuciones y Grau*, 70 D.P.R. 457; *Welch* v. *Henry*, 305 U.S. 134; Paul, *Studies in Federal Taxation*, 3ra. Serie, pág. 442. Las leyes contributivas no son necesariamente inválidas a menos que ellas afecten derechos adquiridos o priven a un contribuyente de su propiedad sin el debido procedimiento de ley. 51 Am. Jur. 143, sección 109; *Kentucky Union Co.* v. *Kentucky*, 219 U.S. 140, 152. Una contribución no viola, necesariamente, la cláusula del debido procedimiento de ley porque sea retroactiva. Es necesario en cada caso específico considerar la naturaleza de la contribución y las circunstancias bajo las cuales se impuso antes de que pueda sostenerse que su aplicación retroactiva es tan severa y opresiva como para traspasar las limitaciones constitucionales. *Tes.* v. *Tribl. Contribuciones y Grau*, supra; *Welch* v. *Henry*, supra.[1] El hecho en sí de que se imponga una contribución implica que el contribuyente pierde parte de su propiedad o de sus recursos económicos. Naturalmente, tal privación no conlleva la inconstitucionalidad de la contribución ya que el contribuyente obtiene un *"quid pro quo"*, o sea, él pierde parte de sus bienes pero en cambio el estado le concede distintos beneficios y oportunidades y le garantiza la protección estadual. El criterio determinante en cuanto a si una ley contributiva infringe la cláusula del debido proceso de ley se refiere a la cuestión de si la ley conlleva alguna relación fiscal con

[1] Como cuestión de hecho ninguna ley estadual de contribuciones sobre la propiedad ha sido declarada inconstitucional por el hecho de que haya sido retroactiva. "Retroactive Federal Taxation", 48 Harv. L. Rev. 592, 595, nota 17.

la protección, oportunidad y beneficios que se conceden por el estado, esto es, si el estado ha dado algo a cambio de lo cual puede exigir la contribución del ciudadano. *Cleveland-Cliffs Iron Co.* v. *State of Michigan*, 45 N.W.2d 46; *Morton Salt Co.* v. *City of South Hutchison*, 159 F.2d 897. Tal como se dijo en *Welch* v. *Henry*, supra, a la página 146:

"Una contribución no es una penalidad impuesta sobre el contribuyente ni constituye una obligación contractual que él asume. La contribución es sólo un medio de distribuir el costo del gobierno entre aquellos que en alguna forma tienen el privilegio de disfrutar de los beneficios de un gobierno civilizado y que, por lo tanto, deben asumir las cargas impuestas en ese gobierno. En vista de que ningún ciudadano disfruta de inmunidad en cuanto a esas cargas, la imposición retroactiva de una contribución no infringe necesariamente la cláusula del debido procedimiento de ley. . ."

Es cierto que la protección estadual y los beneficios obtenidos al amparo de un gobierno de leyes son intangibles y no pueden medirse en forma concreta y específica. Pero ello implica, precisamente, que el contenido y la extensión de la cláusula constitucional del debido proceso de ley son elásticos y flexibles y no pueden medirse ni definirse en forma exacta. El "debido proceso" no es un término de contenido fijo e invariable (*Communications Comm'n* v. *W.J.R.*, 337 U.S. 265, 275), y no es susceptible de ser reducido a fórmulas matemáticas (*Gibbs* v. *Burke*, 337 U.S. 773). El concepto del debido proceso de ley no conlleva requisitos finales, fijos o estrechos y el verdadero problema envuelto en cuanto a la aplicación de tal cláusula no exige que se establezca una línea absoluta en algún punto pero sí implica que las cortes deben señalar sus limitaciones y fronteras a través de un proceso gradual y empírico de inclusiones y de exclusiones. *Wolf* v. *Colorado*, 338 U.S. 25. El debido proceso que se requiere por la Constitución guarda relación con un número de procedimientos que pueden cubrir distintas variedades de situaciones que expresen distintos valores históricos o modernos

de carácter jurídico, social o económico, siempre y cuando que esos mismos valores no estén en conflicto con los principios fundamentales de libertad y de justicia. *Bute* v. *Illinois*, 333 U.S. 640. El debido proceso de ley requerido por la Constitución es un concepto de justicia fundamental que es menos rígido y más flexible que el envuelto en otras cláusulas específicas de la Constitución y su posible infracción debe ser comprobada no a través de reglas generales sino mediante una consideración de la totalidad de los hechos envueltos en cada caso específico. *Betts* v. *Brady*, 316 U.S. 455; *Foster* v. *Illinois*, 332 U.S. 134. La garantía de un debido proceso de ley exige solamente que la ley no sea irrazonable, arbitraria o caprichosa y que los medios utilizados tengan una relación real y sustancial con los propósitos que se tratan de lograr. *Nebbia* v. *New York*, 291 U.S. 502.

 Aplicando esas normas realistas y flexibles en cuanto al problema sometido a nuestra consideración es de válida aplicación el principio de que una contribución retroactiva puede estar justicieramente relacionada con la protección estadual garantizada y con los beneficios y privilegios disfrutados en el pasado.[2] Naturalmente, existen limitaciones en cuanto a la constitucionalidad de una contribución retroactiva. En primer término la contribución no debe ser demasiado remota ya que, de serlo, se pierde la

---

[2] En una opinión disidente emitida en el caso de *Untermyer* v. *Anderson*, 276 U.S. 440, 446, el Juez Holmes se expresó así:

"Una contribución puede ser impuesta por protección y privilegios anteriores al igual que por aquella protección y aquellos privilegios que se concedan en el futuro."

En otra opinión disidente del Juez Brandeis, en el mismo caso, se dijo lo siguiente:

"La necesidad del gobierno de tener ingresos fiscales se ha considerado como una justificación suficiente para imponer contribuciones retroactivas siempre y cuando que la imposición sea consistente con la justicia y siempre y cuando que las condiciones envueltas no impliquen opresión."

No estamos citando opiniones disidentes como autoridades en cuanto a los méritos específicos de este caso pero sí entendemos que esos pronunciamientos de los dos grandes jueces disidentes tienen una innegable validez social y lógica.

significación de la relación entre beneficios y cargas. Además, la contribución no debe ser arbitraria, caprichosa u obviamente injusta y opresiva en tal forma que resulte en una desigualdad evidente entre los beneficios sociales y las cargas contributivas. *Morton Salt Co.* v. *City of South Hutchinson*, supra; *Missouri Pac. R. R.* v. *Road District*, 266 U.S. 187. Sería inconstitucional una contribución retroactiva que sea confiscatoria o que equivalga a un despojo o resulte en una clara desigualdad o injusticia. *Ballester* v. *Descartes*, 181 F.2d 823; *South Porto Rico Sugar Co.* v. *Buscaglia*, 154 F.2d 96. Una contribución retroactiva tampoco puede válidamente afectar derechos adquiridos a través ·de actuaciones definitivas e irrevocables que se hayan realizado antes de haberse aprobado la ley que estableció la contribución retroactiva. *Welch* v. *Henry*, supra, a la pág. 147. Otro criterio determinante se refiere al hecho de si la naturaleza o cantidad de la contribución pudo o no pudo anticiparse razonablemente por el contribuyente al tiempo de realizar el acto voluntario específico que la ley posteriormente constituyó en suceso tributable. *Tes.* v. *Tribl. Contribuciones y Grau*, supra, a la pág. 459; *Welch* v. *Henry*, supra, a la pág. 147; *Nichols* v. *Coolidge*, 274 U.S. 531. En el caso de *Nichols* v. *Coolidge*, supra, el contribuyente había hecho una donación absoluta antes de imponerse la contribución retroactiva y, al tiempo de hacer la donación, él no podía razonablemente anticipar que luego se aprobaría una ley imponiendo una contribución sobre tal donación. El donante podía haber resuelto no hacer la donación si él hubiera sabido que luego se iba a imponer la contribución. Bajo esas circunstancias, se consideró que la contribución retroactiva era tan arbitraria y opresiva que constituía una negación del debido proceso de ley. Sin embargo, en *Milliken* v. *United States*, 283 U.S. 15, 21, se declaró válida una contribución retroactiva sobre donaciones ya que los estatutos anteriores a la donación, aunque no

imponían la contribución exacta impuesta en ese caso, sin embargo conllevaban un aviso razonable de que esa contribución específica podía ser impuesta en el futuro. En síntesis, si la retroactividad en la contribución conlleva una situación de injusticia fundamental, tal retroactividad debe ser declarada inconstitucional.

En *Ballester* v. *Tribunal de Apelación*, 61 D.P.R. 474, 501, se resuelve que la Ley núm. 31 de 1941, enmendatoria de diversas secciones de la Ley de Contribuciones sobre Ingresos, podía válidamente ser aplicada en forma retroactiva a 1 de enero de 1940, aun aumentando los tipos contributivos, sin violar el debido procedimiento de ley.

En el caso de autos lo que hizo nuestra Asamblea Legislativa fué derogar retroactivamente una exención. Generalmente una exención equivale a una gratificación o subsidio. *Grand Lodge* v. *New Orleans*, 166 U.S. 143; *West Wisconsin R. R. Co.* v. *Supervisors*, 93 U.S. 595; 51 Am. Jur. 537, 538, sección 536; Taxes, *The Tax Magazine*, "Tax Exemptions to Encourage Industry", Vol. 29, pág. 383. Naturalmente, si del propio estatuto creador de la exención surge una promesa legislativa de mantener tal exención, ello equivaldría a una obligación contractual y la exención no podría ser derogada. Empero, en el caso de autos no surge tal contrato o promesa legislativa de la Ley núm. 61 de 1945, que establece la exención aquí envuelta y, por lo tanto, ella puede ser derogada.

Lo anteriormente expuesto es suficiente para demostrar que la contribuyente en este caso no tenía un derecho adquirido a la exención. La retroactividad en la derogación de la exención no es arbitraria ni lesiona principio alguno fundamental de justicia. La contribuyente estaba obligada a conocer la naturaleza jurídica de la exención, en cuanto a que ella no creaba derecho irrevocable alguno y la contribuyente debió haber anticipado razonablemente que la exención podía ser derogada en cualquier momento. La contribuyente

asumió los riesgos de cualquier actuación hecha por ella a base de una exención contributiva que de por sí era insegura e inestable.

Se alega, en el caso de autos, que la contribuyente hizo un contrato obligatorio de compraventa del tabaco en junio de 1949 y que de ella haber sabido que se iba a derogar la exención, el precio de venta hubiera sido mayor y que, por lo tanto, es injusta y arbitraria la aplicación retroactiva de la contribución. Ya hemos indicado que la contribuyente debió haber anticipado razonablemente que la exención podía ser derogada en cualquier momento. Además, la contribución no se impuso sobre la venta en sí del tabaco sino que se impuso sobre el tabaco como propiedad.

La retroactividad en este caso no se refería a un período de tiempo demasiado remoto. La Ley 30 de 1950 fué aprobada el día 30 de marzo de ese año y se hizo retroactiva al 1 de enero del mismo año. Ese período de tiempo no es irrazonable. Es evidente que la ley se hizo retroactiva a tal fecha con el propósito de que fuese aplicable al año fiscal 1950–51 ya que el día 15 de enero de cada año es que surge el estado contributivo (*taxable status*) de la propiedad en relación al próximo año fiscal. *Buscaglia, Tes.* v. *Tribl. Contribuciones*, 68 D.P.R. 37, 38 y casos allí citados. Se trataba, por lo tanto, de una cuestión de conveniencia administrativa en cuanto al cobro de las contribuciones.

No siendo arbitraria ni injusta la aplicación retroactiva de la Ley núm. 30 de 1950 el Tesorero actuó correctamente al cobrar la contribución en este caso y el anterior Tribunal de Contribuciones incurrió en error al resolver que tal aplicación retroactiva de la ya mencionada ley era inconstitucional.

*Debe revocarse la sentencia recurrida y en su lugar dictarse una declarando sin lugar y desestimando la demanda de la contribuyente.*